[Cite as *State v. Guffie*, 2024-Ohio-2163.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                 No. 112642

    v.                           :

CURTIS GUFFIE,                          :

    Defendant-Appellant.         :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 6, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-665727-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Brian Callahan, Yasmine H. Hasan, and Mahmoud Awadallah, Assistant Prosecuting Attorneys, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Aaron T. Baker, Assistant Public Defender, *for appellant.*

KATHLEEN ANN KEOUGH, A.J.:

{¶ 1} Defendant-appellant, Curtis Guffie, appeals his convictions for the murder of Jamir Pollard ("Jamir") and attempted murder of Kylan Lumpkin ("Lumpkin"). For the reasons that follow, we affirm his convictions.

## I. Procedural Background

{¶ 2} In 2021, the state charged Guffie in a 13-count indictment accusing him of aggravated murder (Count 1); two counts of murder (Counts 2 and 3); attempted murder (Count 4); four counts of felonious assault (Counts 5-8); two counts of tampering with evidence (Counts 9 and 10); two counts of obstructing justice (Counts 11 and 12); and conspiracy (Count 13). Each count contained both one- and three-year firearm specifications. Guffie pleaded not guilty, and the case proceeded to trial before a jury.

## II. Jury Trial

### A. The Shooting

{¶ 3} On July 21, 2021, Guffie, at the suggestion of his friend and rap artist, Eric West a.k.a. "Fatboi Beanz," messaged Lumpkin through Instagram about hiring him as cameraman to film a music video at a church. Lumpkin suggested the abandoned church on Aetna Road near East 93rd Street. Around 4:25 p.m. on July 22, 2021, Guffie parked his red Nissan Murano across the street from the church on Aetna Road. Lumpkin and his friend, Jamir, arrived at the church in Lumpkin's silver Mercedes Benz C350, which he parked across the street from the church, but farther down the street from Guffie's vehicle. According to Guffie, he did not know either Lumpkin or Jamir prior to this day.

{¶ 4} Over the next 25 minutes, Lumpkin filmed Guffie inside and outside the dilapidated church while he performed and rapped his lyrics. The state played clips of the videos filmed by Lumpkin that recorded not only Guffie's performance,

but also conversations between Guffie and Lumpkin.[1]  In at least two videos, Guffie is seen looking at his cell phone.  Guffie testified that his music for the video played through his phone but that he also received FaceTime calls from Eric West.  In one video, which was filmed on an outside stoop next to the church, Guffie removed his Glock 44 handgun from his pants pocket and showed it to the camera as part of his performance.  At the end of this video, Lumpkin asked Guffie if he wanted to film in front of the church; Guffie agreed.  The next video showed Guffie walking down the sidewalk as his music played.  The end of that video showed Guffie taking a phone call, which he admitted and phone records corroborated, was from Eric West.

{¶ 5} The next video showed Guffie walking down the sidewalk in front of the church, then up the exterior front stairs of the church, opening the church doors, and walking inside the church while performing his rap as he continued walking down the aisle toward the altar where a small piano organ sat in front of the altar steps.  (Exhibit No. 322.)  As Guffie approached the altar steps, he walked to the right of the organ, maneuvering his body so that he faced the aisle but his left shoulder was angled toward the church's front doors.  At approximately one minute and seven seconds into the video, rapid-fire gunshots rang out and Lumpkin's video

---

[1] Tom Ciula, a qualified forensic video and audio expert with the Cleveland Division of Police, testified that he reviewed Lumpkin's camera, which was recovered by officers at the church, extracted the videos from the camera, and created frame-by-frame still images from the videos.  During his testimony, Ciula was not permitted to provide commentary or interpretation about the videos or still frames; he only identified them and played them for the jury.  Accordingly, this court is tasked with explaining the information on the recordings.

camera swung wildly as it continued to record. The camera recorded various sounds, including additional gunshots and muffled voices, but at the 1:21 mark, a voice said, "Get him," followed by two additional gunshots. At the 1:42 mark, a voice said, "He's right here," and at 1:48 an additional shot is fired. At the 1:50 mark, a voice said, "You see him," and at 1:57 two gunshots rang out, followed by one more shot at 2:01. After approximately the 2:04 mark in the video, no additional sounds could be heard until 8:49 into the video when police arrived and announced their presence. The camera continued to record until Officer Neil Pesta discovered it amongst the debris inside the church and turned it off.

{¶ 6} Tessie Alexander, who lives next door to the church, testified that she called 911 at 4:53 p.m. after hearing gunshots at the church. The jury listened to her 911 call.[2] Alexander told the operator that the "shooter left," she heard "about 14 shots," that "one ran out and ran that way," and "one got in the car [and] drove off" in a red car. She testified that a red van was parked across the street in front of her house but she did not see who got in the van, nor did she see anyone else leave the church — contrary to her 911 statement. Alexander testified that as she was talking with the operator, she went outside and saw Jamir stumbling out from the front of the church. She told the operator that he had been shot, and the operator coached

---

[2] Throughout trial, the parties objected to interpretations, explanations, and characterizations of written notes, recorded calls, and statements captured by body camera videos. The objections centered around that the recordings or writings "speaks for itself" and the jury could "assess credibility and meaning." Again, this court throughout this decision is tasked with conveying the information found in these exhibits.

her as she provided Jamir with emergency medical treatment in the street until police arrived.

{¶ 7} Dispatch received a 911 call at 4:56 p.m. from Lumpkin, who police later discovered hiding underneath the floorboards of the church. The jury listened to his 911 call, in which the operator had difficulty understanding Lumpkin because either he was whispering or due to the quality of the call. During the call, Lumpkin told the operator that he was "shooting a music video [and] they shot me * * * I'm hit." Once officers arrived at the church and discovered Lumpkin, the call ended, but officers' body cameras recorded their interactions with him.

{¶ 8} Officer Colbert Stadden testified that around 5:00 p.m. on July 22, 2021, he received a call to respond to 9614 Aetna Road for multiple gunshots. He stated that he was the first officer to arrive on scene and observed a male with multiple gunshot wounds laying in the street being tended to by bystanders. He testified that he learned from the male victim, identified as Jamir, that his "bro [was] in [the] church." Officer Stadden entered the church with other officers, treating the area as an active crime scene. The jury observed video from Officer Stadden's body camera. The video revealed that Lumpkin, who was hiding, was hesitant to respond to officer commands due to his uncertainty about their identities. The officers located Lumpkin, and he emerged from under the floor of the church. In a second video taken from Officer Stadden's body camera, the jury observed a general overview of the church, including shell casings and pools of blood.

{¶ 9} Officer Joseph Fitchwell and his partner, Officer Pesta, responded to Aetna Road regarding shots fired. When they arrived on scene, they discovered a male lying in the street with gunshot wounds. They learned from bystanders that another person could be inside the church. Officer Fitchwell described the scene as "chaotic." The jury observed video from his body camera. After Lumpkin emerged from under the floor, Officer Fitchwell escorted him from the church. Body camera video showed Lumpkin making a phone call, possibly to his mother, and telling the individual that "they shot at us" and then he made threatening statements seeking retaliation about "killing" them and "f***ing them up." (Exhibit No. 426.)

{¶ 10} Officer Anthony DeMarco also responded to Aetna Road. He testified that he observed a male receiving medical treatment from Officer Stecker and saw Officer Fitchwell escorting Lumpkin from the church to the street where the male laid injured. He said Lumpkin appeared to have been shot in the shoulder and described Lumpkin's demeanor as "like an adrenaline rush. He was very, like, full of energy, excited, kind of erratic." The jury watched video from Officer DeMarco's body camera, and observed Lumpkin's demeanor and heard him identify his vehicle parked on the street. When officers asked whether anyone else was shot, Lumpkin responded, "It was just us, they shot at us * * * and I got the dude's number, and he shot at me, I mean he just * * * the dude just deleted his Instagram * * * his name is Ace." (Exhibit No. 425.) Over objection, the state replayed that portion of the video. Officer DeMarco stated that based on the information Lumpkin provided, officers learned that the suspect's nickname was "Ace."

{¶ 11} Officer Anthony Sklarsky stayed inside the church to locate evidence and sweep the area for officer safety. The jury observed video from his body camera, which provided a general overview of the graffitied and debris-filled church. He testified that he was familiar with the church because he had responded to calls regarding break-ins, squatters living in the church, and other incidents there that involved sounds of gunshots. Officer Sklarsky testified that he also walked down the street to interview potential witnesses. His body camera captured footage of Lumpkin's silver Mercedes Benz C350 SUV parked on the street. The state introduced photographs generated from the body camera video of the front- and back-end of Lumpkin's vehicle.

{¶ 12} Officer Pesta also stayed inside the church to locate evidence connected with the shooting. The jury observed video from his body camera, which provided a general overview of the church and crime scene, including various exits and entrances to the church. Officer Pesta testified that he observed blood by the altar and found shell casings nearby. He also located additional shell casings in the back of the church, closer to the main entrance. During his search, Officer Pesta located a video camera and shoe where the floor had caved in and collapsed. He stated that he recovered the camera and turned it off.

**B. Jamir Succumbs to his Injuries**

{¶ 13} Jamir was transported to MetroHealth Medical Center, where he later passed away. Dr. Joseph Felo, Chief Deputy Medical Examiner for Cuyahoga County, testified that he assisted with Dr. Cameron Felty's performance of Jamir's

autopsy. Dr. Felo testified that Jamir sustained five gunshot wounds — to the neck, back, buttock, upper thigh, and left lower leg. Although Dr. Felo stated that the gunshot wound to the neck was the fatal wound, he opined that all the wounds contributed to Jamir's death, which was ruled a homicide.

{¶ 14} Dr. Felo testified that he recovered two bullets from Jamir's body — both were shown to the jury. He described the bullet recovered from Jamir's buttock as gray, with no jacket, and consistent with a .22-caliber bullet. As for the bullet fragment recovered from Jamir's left lower leg, Dr. Felo described it as brass-looking and "jacketed" — consistent with a 9 mm bullet. He also testified about the entrance and exit wounds for each gunshot. He stated that the size of the entrance wounds to the neck and buttock were similar, and the size of the entrance wounds to the back and thigh were similar.

### C. Lumpkin Identifies "Ace"

{¶ 15} EMS transported Lumpkin to MetroHealth Medical Center. His EMS and hospital records were admitted into evidence, with the trial court overruling defense objections to the narratives contained in both exhibits. The narrative on the EMS report provided, "Pt. stated during transport, 'this was a set up we were supposed to be shooting a video.'" (Exhibit No. 482.) The narrative contained in the records from MetroHealth provided, "[Lumpkin] states he went into a church to record a music video when 5 men dressed in black walked into the church and began shooting." (Exhibit No. 485.) A progress note dated July 22, 2021, stated, "[t]he shooting occurred in an abandoned church on E. 93 & Aetna Rd. [Lumpkin] and his

friends were there to film a music video. When they walked into the church, they were shot. [Lumpkin] stated, 'we were set up.'" *Id.* According to Lumpkin's medical records, he suffered three gunshot wounds — two to the back and one to the left shoulder.

{¶ 16} Sergeant James Crivel testified that at the time of the shooting, he was a homicide detective with Cleveland police. He stated that he received the assignment following Jamir's death and worked with Detectives Andrew Hayduk and Fishbach. Sgt. Crivel stated that on July 23, 2021, he interviewed Lumpkin at MetroHealth, who provided him with a name — "Ace Da Cutta." He stated that he searched that name through Facebook, located a post with that name and discovered a last name of "Guffie." He stated that based on a license search and subsequent internet searches, he believed that "Curtis Guffie" was "Ace Da Cutta." According to Sgt. Crivel, Lumpkin identified "Ace" from a music video found on YouTube. The video was titled "Wassup," and featured Fatboi Beanz (Eric West) and Guffie; Tyler West was also identified as a person in the video.

{¶ 17} Sgt. Crivel stated that after this interview, Lumpkin became uncooperative during the investigation. In fact, Lumpkin did not testify at trial.

{¶ 18} Sgt. Crivel issued a warrant for Lumpkin's and Guffie's Instagram accounts because he learned that was how the two arranged the video session. The parties stipulated to the authenticity of the records. Lumpkin's account information was saved on a disk, admitted into evidence, and provided to the jury without objection. (Exhibit No. 505.) Sgt. Crivel testified that "kylo___" was Lumpkin's

username.  Guffie's Instagram account records revealed that "ace_frm_da_4" was Guffie's "vanity name."  (Exhibit No. 488.)

{¶ 19} Sgt. Crivel testified about the Instagram conversation thread between "ace_frm_da_4" and "kyl0___" discussing Guffie hiring Lumpkin as a cameraman for a video.  Because Guffie had deleted his Instagram account and messages with Lumpkin, only Lumpkin's messages remained in the thread.  The thread started with Lumpkin's message sent at 12:34 p.m. on July 21, 2021:

> Yea tomorrow or the 27th
>
> 4 or 6  [Sent at 2:09 p.m.]
>
> Ok so you wanna shoot at da church and yea you can do half today and da other half at the shoot  [Sent at 7:10 p.m.]
>
> I know an abandoned one that's about it
>
> And 350
>
> It's like 93rd and miles
>
> $KYL0000 [Sent at 11:07 p.m.]
>
> Ok
>
> I got it brody  [Sent at 11:18 p.m.]
>
> Yessir send me da song and Imma hit you in da morning 2162058429 [Sent at 12:21 a.m. on July 22, 2021]

(Exhibit No. 487.)

{¶ 20} Lumpkin's Instagram account history also contained conversations between Lumpkin and others on July 23, 2021, discussing the shooting, Jamir's death, YouTube links to Fatboi Beanz's "Wassup" music video, screenshots taken from that video, identifying pictures of "Ace Da Cutta" found on the internet,

including his Twitter account, and information on an address for "Curtis Guffie, Jr."

During these conversations, Lumpkin made the following statements:

N***as set us up at ah video shoot;

His name ace wit da cutta;

Some corny a** n***as idk where Dey from and Dey deleted Dey gram.

(Exhibit No. 505.)  In response to the posted Fatboi Beanz "Wassup" music video picture, Lumpkin stated:

Yup dem n***as;

Dey had on masks;

same n***as.

*Id.*  Lumpkin responded, "Hell yea," when one of his friends responded, "All them in the video * * * That n***a that died in that video to."  *Id.*  In another thread following another picture posted of the "Wassup" music video, Lumpkin stated:

Dats who I think was shooting;

Yea but Dey had on masks so we couldn't tell.

*Id.*

{¶ 21} Lumpkin's Instagram account history also contained an earlier conversation from July 7, 2021.  The conversation thread included a video recorded from a bird's-eye view, i.e., from an upstairs window of a house.  The video was of a person lying on the ground outside a car and receiving emergency medical assistance from a police officer.  The car had crashed into a house and tree.  According to the comments about the video, the unresponsive person was named

"Tyler" — "will look at Tyler dead a\*\*," followed by nine crying-with-laughter face emojis. *Id.*

{¶ 22} Maple Heights Detective Andrew Sperie testified about a murder in Maple Heights that occurred on July 5, 2021, two weeks before the church shooting. He stated that the victim was Tyler West ("Tyler") — the cousin of Eric West. Det. Sperie identified exhibit No. 459 as a picture of Tyler's vehicle that had crashed into a house and tree. He stated, over objection, that as part of his investigation, he learned that Lumpkin's silver Mercedes Benz C350, identified in exhibit Nos. 457 and 461, was the vehicle suspected of being involved in Tyler's murder. Det. Sperie stated that he gave Sgt. Crivel shell casings recovered from the Maple Heights crime scene.

{¶ 23} On cross-examination, Det. Sperie admitted that Tyler's murder was unsolved and no one had been charged, including Lumpkin, even though he classified him as "a person of interest." He admitted that it was unknown whether Lumpkin was actually in his Mercedes on July 5. Det. Sperie agreed that Guffie was not connected to Tyler's murder.

### D. Guffie's First Interview

{¶ 24} On July 24, 2021, two days after the shooting, Sgt. Crivel and Det. Hyudak arrived unannounced at Guffie's residence. The jury observed video from Sgt. Crivel's body camera that recorded this interview.

{¶ 25} Sgt. Crivel testified that he learned during this interview that Guffie had hired Lumpkin based on a recommendation and that he paid him half of the fee.

Guffie told Sgt. Crivel that everything was "cool," but then masked gunmen entered — he "saw the blitz" — and they went straight toward the cameraman, not toward him. He said he, nevertheless, discharged his firearm at the ground as a warning because the "dudes came at my direction." He said he then exited out the front of the church and drove away. Sgt. Crivel testified that he found it significant that Guffie used the term "blitzed" during the interview to describe how the masked gunmen came into the church because he would later discover lyrics on Guffie's phone containing the word "blitzed."

{¶ 26} During the interview, Sgt. Crivel told Guffie that one of the victims had died and that the family was "pointing" at him, and thus it was important for the police to recover his firearm. Guffie told the officers that he had a Glock 30, but that he had disposed of the gun after the shooting by throwing it in the "cut somewhere" — at first, he said beside the church, then he said down an alley or side street.

{¶ 27} Sgt. Crivel asked Guffie during the interview why he did not call the police following the shooting. Guffie responded that he was not comfortable with the police due to prior experiences and that he needed to dissociate himself with Lumpkin, which included deleting his Instagram conversation with Lumpkin.

{¶ 28} Guffie voluntarily accompanied the officers to the church to explain to them the timeline of events; his positioning when the group of masked gunmen entered the church; where, how, and why he discharged his firearm; and how he escaped from the situation. He stated that he shot at one of the masked gunmen but

aimed at the floor. Sgt. Crivel's body camera recorded the reenactment that the jury observed.

{¶ 29} Guffie then assisted the officers with attempting to locate his firearm that he said he discarded outside the church, despite knowing that this was a lie. After 20 minutes of looking, the officers stopped searching and again questioned Guffie about the firearm. According to Sgt. Crivel, Guffie's story about using a Glock 30 did not make sense because the shell casings located where Guffie said he was standing were .22-caliber shell casings; a Glock 30 uses a .45-caliber bullet, which is a larger bullet.

{¶ 30} When they arrived back at Guffie's apartment, Sgt. Crivel explained to Guffie that he wanted to search Guffie's cell phone. He explained that Guffie could voluntarily waive his constitutional rights and consent to a search of his phone, or he would obtain a warrant. Guffie voluntarily signed the waiver and gave the officers his phone, including password access.

### E. Guffie's Cell Phone Extraction

{¶ 31} Jerry Johns testified that he was previously employed as an FBI intelligence analyst in Cleveland, assisting the Cleveland police homicide division. He stated that he assisted in the extraction of data from two cell phones — Guffie's and Jamir's.

{¶ 32} Sgt. Crivel testified that the extraction of Guffie's cell phone proved beneficial to the investigation. Of relevance, the extraction revealed (1) that Guffie's Instagram conversation with Lumpkin was in fact deleted; (2) text messages

between Eric West (hereinafter "Eric" or "Fatboi Beanz" or "Beanz") and Guffie had been deleted; (3) text messages dated July 7, 2021, between Eric and Guffie; (4) Guffie's call log, depicting FaceTime calls with Eric on July 21-22, 2021, including before, during, and immediately after the shooting; (5) photographic evidence of a Glock Model 44 .22-caliber LR handgun; (6) rap lyrics found in the Notes app that Guffie admittedly penned on July 22, 2021, at 7:22 p.m.; (7) that Guffie "blocked" Lumpkin's cell phone number; and (8) Cash App transactions dated July 21, 2021, between Eric and Guffie and then between Guffie and Lumpkin.

{¶ 33} Regarding the deleted text messages between Eric and Guffie, exhibit No. 442 showed and Johns testified to, that although Guffie's texts were deleted, an emoji response by "Beanz" to Guffie's deleted text remained.[3]  In this exhibit, Eric "loved" three text messages sent by Guffie on July 7, 2021 —

> "Definitely keep me in the loop bro.  [praying hands emoji].  The moment you know wassup just hml, you know how dis sh*t go [100 emoji]";

> "Anytime gang.  If we don't look out for each other and our folks then nobody will [arm flexing emoji].  Yaw are family to me and TT so ain't even no question";

> "I'm already knowin [two praying hands emojis]"

(Exhibit No. 442.)

{¶ 34} There were no other text messages with Eric on Guffie's phone until July 22, 2021, the day after the shooting when Guffie sent Eric a message, "You got

---

[3] Guffie saved Eric West's contact information in his phone under "Beanz."  Guffie told officers and testified that "Beanz" is Eric West.

more gas on you?? Dat sh*t from yesterday was some pressure." Eric responded, "Hell yea I do."

{¶ 35} Guffie's call log, exhibit No. 443, revealed that on July 21, 2021, the day before the shooting, Guffie and Eric communicated three times through FaceTime, a video-chat app, at 10:33 p.m., 10:40 p.m., and 11:08 p.m. These times corresponded to when Guffie was arranging the video shoot with Lumpkin. In fact, Guffie's cell phone revealed Cash App transactions during this time between Eric's account, "$FatboiBeanz98," and Guffie. Guffie admitted that Eric loaned him $175 to pay for the video session with Lumpkin. The Cash App transaction showed that Eric sent Guffie $175 at 11:16 p.m. on July 21, 2021, and that Guffie sent Lumpkin ("$KYL0000") $175 at 11:18 p.m.

{¶ 36} On July 22, 2021, Guffie and Eric again communicated through FaceTime. Guffie's phone records revealed that they communicated at 2:44 p.m., 3:52 p.m., 3:55 p.m., 4:10 p.m. (3:37 duration), and 4:23 p.m. (3:34 duration). Surveillance video showed that Guffie arrived at the church around 4:25 p.m. Guffie admitted that he spoke with Eric before and on his way to the video session because he wanted him to be there, but Eric was unavailable.

{¶ 37} Guffie's phone records further revealed that during the video recording session, Guffie called Eric through FaceTime three different times — at 4:27 p.m. (canceled call), 4:28 p.m. (:44 duration), and 4:32 p.m. (1:02 duration). Eric then called Guffie once — at 4:48 p.m. (1:19 duration). Based on Lumpkin's

camera recordings and the 911 calls, the evidence demonstrates that the gunfire started around 4:50 p.m.

{¶ 38} Guffie's phone records revealed that Eric called Guffie at 5:12 p.m. (:29 duration), and Guffie called Eric at 5:16 (:05 duration). Although Guffie stated that he called his wife directly after the shooting, his phone records revealed that he did not call her until 7:30 p.m. and then again at 9:06 p.m. However, he FaceTimed with Eric again that evening at 10:21 p.m., 10:27 p.m., and then at 12:42 a.m. on July 23, 2021.[4]

{¶ 39} Sgt. Crivel testified that the phone extraction also revealed that Guffie had a Glock Model 44 .22 Long Rifle firearm, which would be consistent with the .22 shell casings found at the church where Guffie admitted he was standing when he discharged his firearm. Additionally, a review of the videos on Lumpkin's camera revealed that Guffie possessed the Glock Model 44 during the video shoot.

**F. Guffie's Arrest**

{¶ 40} On July 27, 2021, police arrested Guffie without incident and transported him to Cleveland police headquarters for another interview and statement, which he voluntarily provided without counsel. Sgt. Crivel recorded the interview and the video was played for the jury.

{¶ 41} During the interview, Guffie again lied to the officers about having a Glock 30 during the video shoot. After the officers indicated that the video taken

---

[4] Sgt. Crivel testified that he interviewed Eric West. He admitted that Eric had not been charged with any criminal offense related to this matter.

from Lumpkin's camera revealed that Guffie's firearm was not a Glock 30, Guffie admitted that he actually possessed a Glock 44. He further admitted that he lied to them during the interview on July 24 because he did not discard the handgun in the overgrown vegetation by the church, but instead, the Glock 44 was in his apartment during the first interview. He told the officers that the day after the interview, July 25, 2021, he put the firearm in a blue plastic bag and left it beside a dumpster on Buckeye and East 116th. Sgt. Crivel testified that when he later searched the area, he did not discover the firearm and thus assumed Guffie once again lied to them.

{¶ 42} Unbeknownst to the officers, on July 27, 2021, the same day Guffie was arrested, Edward Golden, a then-employee of MetroHealth Medical Center found a handgun in a blue plastic bag next to a dumpster located in a secure, but unlocked area at Buckeye Health Center on East 116th Street. He stated that he was picking up trash when he discovered the bag. Golden testified that he gave the bag with the handgun inside to "Vincent," a MetroHealth police officer. Sgt. Crivel testified that he did not learn about Golden's discovery of the handgun until approximately one year later.

{¶ 43} During the arrest interview, Guffie questioned the officers whether he actually shot one of the individuals when he discharged his firearm, and surmised that, if so, it would have been Jamir, based on his positioning. He reiterated that he had no intention of shooting at anyone. He stated that he discharged his firearm in self-defense when he saw the group of masked gunmen enter the church. When pressed by Sgt. Crivel that "people might have put you in this situation," Guffie said

that he was being "100 percent honest." Nevertheless, when Sgt. Crivel asked him about the money paid through Cash App, Guffie hesitated, and stated that he did not want to get that person involved. The video clearly showed Guffie's demeanor change when Sgt. Crivel placed Eric's picture in front of him and the officers explained that they did not think Guffie "was the mastermind behind this." After Guffie admitted that "Beanz" loaned him the money and said his given name was "Eric," he pretended not to know "Eric's" last name until officers told him that Eric's last name was on the Cash App. Guffie then stated "West." Guffie explained that Eric only loaned him the money because he did not have the full $350 to pay Lumpkin.

{¶ 44} Guffie denied knowing Tyler West. When Sgt. Crivel showed him the "Wassup" music video that featured Tyler, Guffie maintained that he did not know him.

### G. Ballistic Testimony and Evidence Makes a Match

{¶ 45} Daniel Lentz, a detective with Cleveland police homicide unit, testified that he and two other detectives identified, preserved, and collected evidence inside and outside the church. He stated that they discovered three Rimfire .22-caliber shell casings to the right of the piano organ, where Guffie subsequently told officers he was standing when he discharged his weapon. Detective Lentz also discovered the spent tip of a 9 mm bullet and one live 9 mm round behind the organ, up on the

altar area, by a pool of blood.[5]  Finally, he stated that officers discovered eleven 9 mm casings on the right side of the church, near the back by the entrance doors.  No evidence was discovered in the church's balcony.

{¶ 46} James Kooser, a forensic scientist and firearm and tool marks examiner with the Cuyahoga County Forensic Science Laboratory, testified about his examination of the bullets, shell casings, and firearms recovered in this matter.

{¶ 47} He testified that he examined two firearms — a Springfield Armory 9 mm caliber pistol ("Springfield") and a Glock Model 44 .22 Long Rifle-caliber pistol ("Glock Model 44").  Both firearms were test fired and determined to be operable.

{¶ 48} Kooser stated that he examined the bullets recovered during Jamir's autopsy.  According to Kooser, the bullet recovered from Jamir's leg was consistent with "380-caliber/9 mm caliber ammunition," but it was inconclusive whether it was fired from the Springfield.  Regarding the bullet recovered from Jamir's buttock, Kooser testified that the bullet was consistent with .22 Long Rifle-caliber ammunition, and further examination revealed that it was fired from the Glock Model 44.

{¶ 49} Kooser also examined the shell casings recovered from the church.  He stated that ten of the eleven 9 mm shell casings were fired from the Springfield.  The other 9 mm shell casing was fired from an unknown firearm.  Regarding the three

---

[5] DNA evidence revealed that only Jamir's blood was found inside the church.

.22 Long Rifle-caliber shell casings found to the right of the organ, Kooser stated that those casings were fired from the Glock Model 44.

{¶ 50} Over objection, Kooser testified that he examined 14 shell casings recovered from the Maple Heights crime scene where Tyler was killed. He stated that three of the 9 mm shell casings were fired from the Springfield.

{¶ 51} Sgt. Crivel testified that the Springfield was purchased by Tyler West in June 2020. He further stated that Guffie purchased the Glock Model 44 in 2020 and that it was the firearm that Guffie subsequently admitted he possessed and used during the church shooting.[6]

## H. Guffie Testifies

{¶ 52} Guffie denied that he conspired with anyone, including Eric West, to kill or harm Lumpkin or Jamir. He recounted what had occurred and asserted that he discharged his weapon in self-defense when he saw the masked gunman, who was standing near Jamir, turn and look at him. Guffie stated that he perceived the look to be a threat and because the male had a gun and Jamir was already down, he fired three shots aiming toward the gunman, but at the ground — "a leg-type" shot. He stated that the gunman then ducked down, allowing him to exit out the front doors and drive away.

---

[6] The court prohibited the defense from introducing an ATF Cleveland Field Office Crime Gun report (proffered exhibit E) that indicated that the Springfield firearm was recovered following another shooting in Cleveland in September 2021.

{¶ 53} Guffie testified that he left the scene but stopped on a side street to collect himself. He said that he deleted his Instagram to dissociate himself from Lumpkin's "beef" with someone. Guffie testified that he also called his wife to tell her what had happened and called Eric to tell him not to come to the video session. Phone records corroborated that he called Eric West, but the records do not show that he called his wife until hours later.

{¶ 54} Regarding the rap lyrics discovered on his phone, Guffie stated that he composed the lyrics after the shooting, but that they were not in reference to the church shooting and were of "no particular significance." (Tr. 1386-1387.) He did not offer any further explanation about the lyrics but denied that the lyrics were a "statement." (Tr. 1465.)

{¶ 55} Guffie admitted that he was untruthful with officers and recognized that the choices he made — lying to the police, hiding the firearm, not calling 911, and deleting Instagram messages — were bad decisions and not beneficial to his case. Nevertheless, he adamantly denied that he had any intention of harming anyone or that he was the "monster" that people made him out to be. He claimed that "everything was being misconstrued." (Tr. 1403.)

## I. The Verdict

{¶ 56} The jury found Guffie not guilty of aggravated murder as charged in Count 1, but guilty of the remaining offenses and specifications. After merging allied offenses, the trial court sentenced him to 24 years to life in prison.

{¶ 57} Guffie now appeals, raising ten assignments of error that will be addressed together where appropriate.

### III. Sufficiency of the Evidence

{¶ 58} In his first assignment of error, Guffie contends that the trial court erred by denying judgments of acquittal pursuant to Crim.R. 29, and thereafter entering judgments of conviction that were not supported by sufficient evidence, in derogation of his right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution, and Section 16 of the Ohio Constitution.

{¶ 59} Guffie does not separately identify each charge that he was convicted of or argue that the state failed to prove one or more of the elements of each offense. Instead, he contends that the evidence was insufficient because (1) Lumpkin did not testify, and thus the state engaged in a "victimless prosecution"; and (2) the state impermissibly engaged in inference stacking to obtain a conviction. Both arguments are without merit.

{¶ 60} We reject Guffie's argument that the state engaged in a "victimless prosecution" because Lumpkin did not testify. This Confrontation Clause argument is not appropriate under a sufficiency standard of review.

{¶ 61} Rather, the test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Cottingham*, 8th Dist. Cuyahoga No. 109100, 2020-Ohio-4220, ¶ 32. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to

examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.*

{¶ 62} Guffie next contends that his convictions are based on insufficient evidence because the state engaged in impermissible inference stacking. We disagree.

{¶ 63} Proof of guilt may be supported "'by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value.'" *State v. Rodano*, 2017-Ohio-1034, 86 N.E.3d 1032, ¶ 35 (8th Dist.), quoting *State v. Zadar*, 8th Dist. Cuyahoga No. 94698, 2011-Ohio-1060, ¶ 18. Although circumstantial evidence and direct evidence have obvious differences, those differences are irrelevant to the probative value of the evidence, and circumstantial evidence carries the same weight as direct evidence. *Id.*, citing *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Further, circumstantial evidence is not only sufficient, "'"but may also be more certain, satisfying, and persuasive than direct evidence."'" *Id.* at ¶ 36, quoting *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

{¶ 64} Whether a conviction is based on inference stacking goes to the sufficiency of the evidence. *State v. Jones*, 8th Dist. Cuyahoga No. 108371, 2020-Ohio-3367, ¶ 66. Ohio law generally precludes the stacking of inferences to prove a claim. *State v. Brown*, 8th Dist. Cuyahoga No. 106518, 2018-Ohio-3674, ¶ 19, citing *Estate of Bier v. Am. Biltrite*, 8th Dist. Cuyahoga No. 97085, 2012-Ohio-1195, ¶ 22. "An inference which is based solely and entirely upon another inference and which is unsupported by any additional fact or another inference from other facts is an inference upon an inference and is universally condemned." *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St.3d 329, 130 N.E.2d 820 (1955), paragraph one of the syllabus; *Davis v. Cuyahoga Metro. Hous. Auth.*, 8th Dist. Cuyahoga No. 97356, 2012-Ohio-3077, ¶ 13.

{¶ 65} There are two instances, however, when the rule against inference stacking does not apply. The first is when "[a]n inference which is based in part upon another inference and in part upon factual support is called a parallel inference and is universally approved provided it is a reasonable conclusion for the jury to deduce." *Id.* at paragraph three of the syllabus. The second is when multiple inferences arise separately from the same set of facts. *McDougall v. Glenn Cartage Co.*, 169 Ohio St. 522, 160 N.E.2d 266 (1959), paragraph two of the syllabus.

{¶ 66} Guffie contends that the state used impermissible inference stacking to prove that he conspired in the shooting at the church as revenge for the death of Tyler. He claims that the jury had to infer that Lumpkin killed Tyler and that Eric conspired with Guffie to seek retribution against Lumpkin. While Guffie may be

correct that the jury needed to make certain inferences, those inferences were supported by both direct and circumstantial evidence.

{¶ 67} First, the state did not have to prove that Lumpkin actually killed Tyler, but only that Lumpkin was involved in Tyler's death. Based on the direct evidence that Lumpkin's vehicle was seen in the area at the time of Tyler's murder, he was a person of interest in the investigation, and because his Instagram account history contained a video of and comments about Tyler dying and receiving emergency medical treatment, the jury could reasonably infer that Lumpkin was connected with Tyler's death.

{¶ 68} According to Guffie's own testimony, he and Eric were friends that "grew into like a brotherhood * * * [who] communicated all the time." In fact, when Eric's cousin Tyler passed away, he consoled his friend and testified that he felt bad about not attending the funeral. Guffie admitted that Eric recommended that he use Lumpkin as his cameraman and even gave him the money to pay Lumpkin. Guffie further admitted that he FaceTimed with Eric prior to and throughout the video recording session. Accordingly, circumstantial evidence existed that proved that Eric knew that Lumpkin was at the church that day.

{¶ 69} Direct evidence was presented linking the Maple Heights murder with the church shooting. Ballistic testing on shell casings revealed that the Springfield firearm owned once by Tyler was fired at both the Maple Heights crime scene and during the church shooting. Accordingly, the jury could infer that someone with a connection to Tyler was involved in the church shooting.

{¶ 70} The state also presented evidence that Lumpkin identified Eric and Guffie as the individuals that shot at him and Jamir. This evidence came in through (1) Lumpkin's own statements to police immediately following the shooting; (2) his statements to police at the hospital, including that it was a "set up"; and (3) his Instagram account conversations days after the shooting when he told friends that "Ace wit da Cutta" was involved, identified Guffie through various photographs taken from the internet, and posted Eric's music video "Wassup," where he said, "Yup dem n***as," in reference to who shot at him and Jamir. Accordingly, the jury heard evidence that both Guffie and Eric were involved in the shooting.

{¶ 71} Finally, the state presented direct evidence that Guffie was present at the church with Lumpkin and Jamir and that Guffie discharged his firearm multiple times, with at least one of the bullets striking Jamir in the buttock. The evidence showed that the size of the entrance wound to Jamir's buttock was similar in size to the entrance wound in Jamir's neck, which was the fatal wound. Lumpkin was also shot during the incident, although no bullet was recovered from his shoulder or back. Accordingly, there was no question that Guffie shot Jamir.

{¶ 72} The state also presented sufficient evidence that Guffie tampered with evidence by deleting his Instagram account and text messages and hiding the Glock 44 he owned and fired during the incident. The state presented sufficient evidence that Guffie obstructed justice by lying to the officers on multiple occasions, including about the location of where he discarded his firearm. Finally, sufficient evidence was presented that he conspired with "unknown conspirators" because the state

presented direct evidence that Eric West connected Guffie with Lumpkin, supplied him with the funds to pay Lumpkin, and communicated with Guffie during the video session and then immediately following the shooting. Viewing the evidence in favor of the state, Guffie's conduct in hiring Lumpkin, arranging to meet him at the church, and then discharging his firearm during the ambush, constituted a substantial overt act in furtherance of the conspiracy.

{¶ 73} Accordingly, we find that the direct and circumstantial evidence, and any reasonable inferences that could be made therefrom, sufficiently supported Guffie's convictions. The first assignment of error is overruled.

## IV. Manifest Weight of the Evidence

{¶ 74} Guffie's theory of the case was that he acted in self-defense when he fired his weapon at an unknown masked gunman who was standing near Jamir, who was lying on the ground. He said that he believed that he was in imminent danger based on the look the masked gunman gave him. Guffie stated he fired at the ground or the leg of the gunman because he was not trying to kill anyone (tr. 1429), but just trying to escape the situation and defend himself. He stated that he did not intend to shoot at or kill Jamir, only to defend himself from what he perceived to be a dangerous situation.

{¶ 75} Guffie contends in his second assignment of error that the trial court erred by entering judgments of conviction that were against the manifest weight of the evidence and in derogation of his right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution. Specifically, he contends

that the state failed to prove that he did not act in self-defense when he discharged his firearm, and thus the jury lost its way in determining that he did not act in self-defense.

{¶ 76} The state's duty to prove beyond a reasonable doubt that a defendant did not act in self-defense is subject to a manifest-weight-of-the-evidence review. *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, ¶ 27. "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on its effect in inducing belief.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. In a manifest-weight analysis, the reviewing court sits as the "thirteenth juror" and reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered.'" *Thompkins* at *id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction. *Thompkins* at 386.

{¶ 77} A trier of fact is free to believe all, some, or none of the testimony of each witness testifying at trial. *Jones*, 8th Dist. Cuyahoga No. 108371, 2020-Ohio-

3367, at ¶ 85; *State v. Sheline*, 8th Dist. Cuyahoga No. 106649, 2019-Ohio-528, ¶ 100. Thus, "[a] conviction is not against the manifest weight of the evidence simply because the jury believed the testimony of the state's witnesses and disbelieved the defendant," *id.*, or the defendant's theory of the case.

{¶ 78} "Self-defense claims are generally an issue of credibility." *State v. Walker*, 8th Dist. Cuyahoga No. 109328, 2021-Ohio-2037, ¶ 13. "Whether the state disproves any of the elements of self-defense is left to the trier of fact to decide." *State v. Davidson-Dixon*, 2021-Ohio-1485, 170 N.E.3d 557, ¶ 36 (8th Dist.), citing *State v. Morton*, 147 Ohio App.3d 43, 2002-Ohio-813, 768 N.E.2d 730, ¶ 52 (8th Dist.). The burden of proof lies with the state to prove beyond a reasonable doubt that the accused did not use the force in self-defense if the evidence presented at trial tends to support a self-defense claim. R.C. 2901.05(B)(1). *State v. Gardner*, 8th Dist. Cuyahoga No. 110606, 2022-Ohio-381, ¶ 24.

{¶ 79} In order to establish the inapplicability of self-defense, the state must demonstrate that the defendant (1) was at fault in creating the situation giving rise to the affray; (2) lacked a bona fide belief that he was in imminent danger of death or great bodily harm or that another means of escape from such danger existed negating the need for the use of deadly force; or (3) violated a duty to retreat or avoid the danger. *Walker* at ¶ 14, citing *State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 46 (8th Dist.). Because of the cumulative nature of the elements of self-defense, "the state need only disprove one of the elements of self-defense beyond a reasonable doubt at trial." *Walker* at ¶ 13.

{¶ 80} Although the defense theorized that Eric used Guffie as an unsuspecting pawn to set up Lumpkin, the jury chose to believe the state's theory that Guffie acted in concert with Eric to seek retribution against Lumpkin for the death of Eric's cousin Tyler. The evidence established that by Guffie connecting with Lumpkin, leading him to an area where Eric or others knew he would be, Guffie contributed to creating the situation giving rise to the affray. Accordingly, the state satisfied its burden in disproving Guffie's self-defense claim.

{¶ 81} This court finds that the state's evidence also established that Guffie lacked a bona fide belief that he was in imminent danger of death or great bodily harm. First, by Guffie's own admission, Jamir was shot and collapsed on the ground, thereby presenting no danger to Guffie to use deadly force toward Jamir.

{¶ 82} More importantly, however, is the sequence of events that occurred that shows that Guffie lacked a bona fide belief of imminent danger regarding the gunman. The evidence revealed that a group of masked men ambushed the "unsuspecting" occupants of the church, initially shooting from the back of the church by the front entrance where detectives discovered eleven 9 mm shell casings on the right side of the aisle — the same side to which Guffie had moved immediately prior to the shooting. Despite the rapid gunfire, only Jamir and Lumpkin were shot. And despite Guffie seeing the masked gunman who had possibly just shot Jamir and stood near his body, he never shot at Guffie. Rather, Guffie turned his back and exited unscathed out the front doors of the church, which was not his closest exit.

This evidence and Guffie's actions do not demonstrate that he had a bona fide belief of imminent danger of death or great bodily harm.

{¶ 83} Guffie's self-defense claim is also doubtful because he did not contact police at any time after the shooting to report the ambush. Understandably, he was apprehensive about involving himself in what appeared to be a "set up" or "hit," but Guffie knew that he had discharged his firearm and that video evidence would reveal that he was at the church and that at least one person was shot. Accordingly, his claim of self-defense should have outweighed any thought of being accused of murder or attempted murder. By not coming forward and then lying to police about his firearm, the jury and this court can reasonably conclude that Guffie was not acting in self-defense when he discharged his firearm at the church.

{¶ 84} This court, sitting as the "thirteenth juror," has carefully reviewed the entirety of the evidence presented at trial, and we conclude that the jury did not lose its way and create a manifest miscarriage of justice in finding Guffie guilty of murder and attempted murder, despite his claim of self-defense. This is not the exceptional case where the evidence weighs heavily against the jury's verdict. Guffie's second assignment of error is overruled.

## V. Transferred Intent — Self-Defense

{¶ 85} Guffie contends in his third assignment of error that he received ineffective assistance of counsel because counsel failed to seek a jury instruction on the issue of transferred intent or transferred justification self-defense. In his fourth

assignment of error, Guffie contends that the trial court committed plain error by failing to instruct the jury on transferred intent self-defense.

{¶ 86} The doctrine of transferred intent is generally applied to culpability. It provides that "where an individual is attempting to harm one person and as a result accidentally harms another, the intent to harm the first person is transferred to the second person and the individual attempting harm is held criminally liable as if he both intended and did harm the same person." *State v. Jones*, 8th Dist. Cuyahoga No. 80737, 2002-Ohio-6045, ¶ 79.

{¶ 87} Guffie asks this court to recognize the doctrine of transferred intent as it applies to self-defense to award him a new trial based on a finding that his counsel was ineffective for failing to seek a jury instruction on this doctrine or that the trial court committed plain error in not instructing the jury on this doctrine. We decline to do so under the facts presented and the arguments raised.

{¶ 88} This court has not definitively held that the doctrine of transferred intent applies to self-defense claims. *See State v. Hurt*, 8th Dist. Cuyahoga No. 110732, 2022-Ohio-2039, ¶ 71 ("[I]t is not clear that the doctrine of transferred intent applies to self-defense."); *State v. Campbell*, 8th Dist. Cuyahoga No. 112958, 2024-Ohio-1693, ¶ 47; *State v. Howard*, 4th Dist. Ross No. 07CA2948, 2007-Ohio-6331; *but see State v. Clifton*, 32 Ohio App.2d 284, 290 N.E.2d 921 (1st Dist.1972) (applying the doctrine of transferred intent to self-defense claims). Under the facts of this case, we cannot find that the trial court committed plain error in failing to instruct the jury on transferred intent self-defense. *State v. Rogers*, 143 Ohio St.3d

385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22 (Plain error is an obvious error or defect in the trial court proceedings that affects a defendant's substantial right and the outcome of the trial.).

{¶ 89} We find that trial counsel's performance was not deficient for the same reason. Reversal of a conviction for ineffective assistance of counsel requires that the defendant show that counsel's performance was deficient and that the deficient performance prejudiced the defense to deprive the defendant of a fair trial. *State v. Nieves*, 8th Dist. Cuyahoga No. 111161, 2022-Ohio-3040, ¶ 27, citing *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 109. Deficient performance occurs when counsel's performance falls below an objective standard of reasonable representation. *State v. Bell*, 8th Dist. Cuyahoga No. 105000, 2017-Ohio-7168, ¶ 23. Prejudice is found when "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because we find that Guffie cannot demonstrate that his trial counsel rendered deficient performance, the two-part *Strickland* test cannot be satisfied. *State v. Hurst*, 12th Dist. Brown No. CA2014-02-004, 2014-Ohio-4890, ¶ 7 (failure to satisfy one part of the *Strickland* test negates a court's need to consider the other).

{¶ 90} Although the trial court instructed the jury on self-defense, defense counsel did not seek an actual jury instruction on the issue of transferred intent or transferred justification relating to self-defense. But a close review of the record reveals that counsel advocated for the inclusion of the word "individuals" in the self-

defense instruction provided to the jury. The instruction permitted the jury to consider "the conduct of the individuals at the scene and decide whether their acts or words caused the defendant to reasonably and honestly believe that the defendant was about to be killed or receive great bodily harm." (Tr. 1521.) This instruction allowed the jury to consider all of the individuals on the scene and permitted the jury to analyze how the actions of all persons, including the unknown masked gunman, would have affected Guffie's belief about the danger he faced.

{¶ 91} In fact, throughout the trial and in closing arguments, defense counsel focused his theory and arguments on Guffie's claim that he acted in self-defense when he discharged his firearm at the unknown gunman, but inadvertently shot Jamir. Accordingly, although defense counsel did not seek an actual "transferred intent self-defense" instruction, the instructions given, arguments made, and evidence presented, implicitly permitted the jury to consider whether Guffie's actions were inadvertent or purposeful in light of the situation he perceived.

{¶ 92} The state reminded the jury, however, that self-defense was not available if Guffie was responsible for causing the affray, i.e., arranging the ruse with Eric or other unknown conspirators. In fact, the jury did not find that Guffie had acted in self-defense when he shot at the unknown masked gunman. It logically flows that in order to find that transferred intent self-defense applies, the trier of fact must first find that the defendant acted in self-defense. *See Campbell*, 8th Dist. Cuyahoga No. 112958, 2024-Ohio-1693, at ¶ 47 (jury found appellant did not act entirely in self-defense, thus counsel was not ineffective for failing to request a

transferred intent self-defense instruction). For the reasons previously discussed, the weight of the evidence suggested that Guffie did not act in self-defense when he discharged his firearm inside of the church.

{¶ 93} Based on the record, we find that Guffie was not deprived of effective assistance of counsel and the trial court did not commit plain error by failing to instruct the jury on transferred intent self-defense. Accordingly, Guffie's third and fourth assignment of errors are overruled.

## VI. Evidentiary Rulings

{¶ 94} In his fifth, sixth, seventh, and eighth assignments of error, Guffie challenges certain evidentiary rulings made by the trial court that he contends deprived him of due process and a fair trial. We will not reverse a trial court's ruling on evidentiary issues absent an abuse of discretion and proof of material prejudice. *See State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 116.

### A. Evid.R. 805 — Hearsay within Hearsay

{¶ 95} During his cross-examination of Officer Sklarsky, Guffie attempted to question him about a report he authored following officers interviewing Lumpkin at the hospital. The state objected, contending that the report contained inadmissible hearsay because Officer Sklarsky only drafted the report; he did not take the statements from Lumpkin that were included in the report. The trial court sustained the state's objection, finding the report was "classic double hearsay." (Tr. 657.)

{¶ 96} Defense counsel proffered the report and its contents. The proffer included exhibit B, which was Officer Sklarsky's authored report. The report

provided that Officer Pendleton spoke with Lumpkin at MetroHealth who told him that

> he and [Jamir] were shooting a music video when a black male who[m] he recognized. Lumpkin also stated, the male was started [sic] shooting at him and [Jamir] because they owe him money. Lumpkin stated, "It was a set up." Lumpkin was uncooperative and would not share any further information. [Jamir] was also uncooperative and would not share any information of the incident.

(Tr. 655); Defendant's Proffered Exhibit B.

{¶ 97} Subsequently, during Sgt. Crivel's testimony, Guffie attempted to again introduce Lumpkin's statement to Officer Pendleton when it was contained in defendant's proffered exhibit E, an ATF Crime-gun report. The trial court again sustained the state's objection.

{¶ 98} Guffie contends in his fifth assignment of error that the trial court deprived him of the fundamental right to present a defense as guaranteed under the due process clause of the Fourteenth Amendment to the U.S. Constitution, when the trial court "mechanicalistically" applied the hearsay rule to defeat exculpatory evidence.

{¶ 99} Evid.R. 801 defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is generally inadmissible unless it falls under an exception. Evid.R. 802. Hearsay within hearsay, or double hearsay, "is not excluded under the hearsay rule if each part of the combined statements

conforms with an exception" to the hearsay rules. Evid.R. 805; *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 183.

{¶ 100} We find that Guffie has not satisfied his burden by demonstrating error. He does not explain why the rules of hearsay do not apply or how each part of the combined statements conforms with an exception to the hearsay rule; he just contends that the rules should not be applied "mechanically to defeat the ends of justice."

{¶ 101} Nevertheless, even if the statements made by Lumpkin to Officer Pendleton were admissible, Guffie has not demonstrated material prejudice. The statements Lumpkin made to Officer Pendleton indicated that (1) Lumpkin knew the shooter; and (2) it was a set up. The fact that Lumpkin offered a "motive" — he owed the shooter money — does not negate the fact that someone set him up. In fact, Guffie told officers and testified that he believed the shooting occurred because of a vendetta against the victims; the shooters were more focused on the cameraman. (Tr. 1383; exhibit No. 700.) This information supports the state's theory of the case — Guffie conspired with Eric West or other unknown conspirators to ambush Lumpkin in retribution. Accordingly, Guffie's fifth assignment of error is overruled.

### B. Confrontation Clause — Lumpkin Does Not Testify

{¶ 102} Officer DeMarco testified that Lumpkin appeared to have been shot in the shoulder. He described Lumpkin's demeanor as "like an adrenaline rush. He was very, like, full of energy, excited, kind of erratic." The jury watched video from

Officer DeMarco's body camera. The jury also observed Lumpkin's demeanor and heard him identify his vehicle parked on the street and tell the officers "it was just us, they shot at us * ** "and I got the dude's number, and he shot at me, I mean he just * * * the dude just deleted his Instagram * * * his name is Ace." (Exhibit No. 425.) Over objection, the state replayed that portion of the video. Officer DeMarco stated that based on the information Lumpkin provided, officers learned that the suspect's nickname was "Ace." Officer DeMarco's body camera video was admitted into evidence without objection.

{¶ 103} In his sixth assignment of error, Guffie contends that the trial court abused its discretion in allowing Officer DeMarco's testimony because it violated hearsay rules and his right to confront witnesses. Although not reiterated in this assignment of error, Guffie previously asserted that the state engaged in "victimless prosecutions" where the victim does not testify at trial.

{¶ 104} The Sixth Amendment of the U.S. Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the admission of a testimonial out-of-court statement of a witness who does not appear at trial violates the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.

{¶ 105} The Confrontation Clause does not bar the admission of hearsay statements that are not testimonial. *Davis v. Washington*, 547 U.S. 813, 823, 126

S.Ct. 2266, 165 L.Ed.2d 224 (2006); *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, ¶ 21. Indeed, where nontestimonial hearsay is at issue, the Confrontation Clause is not implicated at all and need not be considered. *Cleveland v. Johnson*, 8th Dist. Cuyahoga No. 107930, 2019-Ohio-3286, ¶ 14, citing *Whorton v. Bockting*, 549 U.S. 406, 420, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007).

{¶ 106} Although it has not defined "testimonial," in *Crawford*, the U.S. Supreme Court stated generally that the core class of statements implicated by the Confrontation Clause includes statements "made under circumstances which would lead an objective witness to reasonably believe that the statement would be available for use at a later trial." *Crawford* at 52. "The Court found that at a minimum, testimonial evidence includes prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and statements made during police interrogations." *Johnson* at ¶ 15, citing *Crawford* at 68; *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 144, citing *Crawford* at 68.

{¶ 107} However, "'not all those questioned by the police are witnesses and not all "interrogations by law enforcement officers" * * * are subject to the Confrontation Clause.'" *State v. Williams*, 8th Dist. Cuyahoga No. 112481, 2024-Ohio-337, ¶ 24, quoting *Michigan v. Bryant*, 562 U.S. 344, 355, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), quoting *Davis* at 826. This court recently stated:

> Whether statements to police officers are testimonial depends on the primary purpose of the interrogation. "[S]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of interrogation is to enable police assistance to meet an ongoing

emergency." *Davis*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224. Further, police interrogations of witnesses and victims can be deemed nontestimonial after the initial encounter if an ongoing emergency exists. *Id.* An ongoing emergency can exist after the original threat to the victim has ceased to exist if there is a potential threat to the victim, police, or the public, or the victim needs emergency medical services. *Bryant* at 376. "[T]he Supreme Court has never defined the scope or weight of the 'ongoing emergency.'" *Woods v. Smith*, 660 Fed.Appx. 414, 428 (6th Cir.2016). The outer bounds of what is considered an "ongoing emergency" is purposely not defined and is instead based on a "highly context-dependent inquiry." *Bryant* at 363.

*Williams* at ¶ 25.

{¶ 108} In this case, an ongoing emergency existed. Both Lumpkin and Jamir were seriously injured after being shot inside the church. The perpetrator(s) had not yet been identified and it was unknown whether the shooter(s) were still in the area. A potential threat still existed to the victims, police, and the public. Accordingly, we conclude that Lumpkin's statements to the police "it was just us, they shot at us * * * and I got the dude's number, and he shot at me, I mean he just * * * the dude just deleted his Instagram * * * his name is Ace," was nontestimonial because it was made in connection with an ongoing emergency, and thus did not violate the Confrontation Clause.

{¶ 109} Because Lumpkin's statements are not testimonial, they are admissible if they fall within a hearsay exception under the evidence rules. *Williams*, 8th Dist. Cuyahoga No. 112481, 2024-Ohio-337, at ¶ 35. In *Williams*, this court stated, "The state's evidentiary rules, however, are only applicable if the statement does not violate the Confrontation Clause."

"Whenever the state seeks to introduce hearsay into a criminal proceeding, the court must determine not only whether the evidence fits within an exception, but also whether the introduction of such evidence offends an accused's right to confront witnesses against him."

*Id.*, quoting *State v. Powell*, 2019-Ohio-4345, 134 N.E.3d 1270, ¶ 38 (8th Dist.), citing *State v. Kilbane*, 8th Dist. Cuyahoga No. 99485, 2014-Ohio-1228, ¶ 29; *see also State v. Issa*, 93 Ohio St.3d 49, 60, 752 N.E.2d 904 (2001).

{¶ 110} At the outset, Guffie contends that none of the exceptions to the hearsay rules exist. We disagree. Lumpkin's statement to police was admissible, at the very least, under the excited utterance exception to the hearsay rules. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Such statements are inadmissible unless an exception to the hearsay rule applies. Evid.R. 802.

{¶ 111} One such exception is an excited utterance, which is defined as "a statement relating to a startling event or condition made while the declarant was under the stress of the excitement caused by the event or condition." Evid.R. 803(2). "The rationale for the admission of these statements is that the shock of the event causes the declarant's reflective process to be halted. Thus, the statement is unlikely to have been fabricated and carries a high degree of trustworthiness." *State v. Butcher*, 170 Ohio App.3d 52, 2007-Ohio-118, 866 N.E.2d 13, ¶ 27 (11th Dist.).

{¶ 112} For a statement to fall within the excited utterance exception, four elements must be satisfied: (1) a startling event; and (2) a statement relating to that

event; (3) made by a declarant with firsthand knowledge; (4) while the declarant was under the stress of the excitement caused by the event. *State v. Smith*, 8th Dist. Cuyahoga No. 112880, 2024-Ohio-963, ¶ 14, citing *State v. Shutes*, 8th Dist. Cuyahoga No. 105694, 2018-Ohio-2188, ¶ 36, citing *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 123.

{¶ 113} A statement may be an excited utterance even if it is not made strictly contemporaneously with the startling event. *State v. Duncan*, 53 Ohio St.2d 215, 219, 373 N.E.2d 1234 (1978). There is no per se length of time after which a statement may no longer be considered to be an excited utterance. *State v. Taylor*, 66 Ohio St.3d 295, 303, 612 N.E.2d 316 (1993). Thus, the passage of time between the event and the statement is relevant but not dispositive. *Id*. "Each case must be decided on its own merits, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous declaration." *Duncan* at 219-220. "The central requirements are that the statement must be made while the declarant is under the stress of the event, and the statement may not be a result of reflective thought." *Shutes* at ¶ 37, citing *Taylor* at 303.

{¶ 114} There is no question that Lumpkin was still under the stress of the excitement caused by the shooting when he told officers that "it was just us, they shot at us * * * and I got the dude's number, and he shot at me, I mean he just * * * the dude just deleted his Instagram * * * his name is Ace." Officer DeMarco described, and the jury observed, Lumpkin's demeanor as "like an adrenaline rush.

He was very, like, full of energy, excited, kind of erratic." Additionally, other body camera evidence showed Lumpkin extremely furious and threatening revenge, potentially implicating himself. Accordingly, we cannot say that Lumpkin made these statements with reflective thought.

{¶ 115} Even if Lumpkin's statement somehow violated Guffie's right to confront witnesses or was inadmissible hearsay, the error was harmless because Lumpkin later identified "Ace" at the hospital and the other individuals involved. Additionally, Lumpkin's Instagram account history, which was not objected to, included statements that Guffie was involved and shot at them. Finally, Guffie testified that he was at the church, deleted his Instagram conversations with Lumpkin, and admitted to discharging his firearm. Accordingly, when Lumpkin told police immediately following the shooting, the information was cumulative to other admissible evidence. Guffie's sixth assignment of error is overruled.

## C. Rap Lyrics

{¶ 116} Sgt. Crivel testified that during the search extraction of Guffie's phone, rap lyrics were found in the "Notes" App that were composed hours after the shooting. Prior to trial, defense counsel filed a motion in limine to prevent the state from introducing these lyrics, contending that the lyrics were unfairly prejudicial. The lyrics of this song are as follows:

> Dis dat killa
> Dis dat smooth talkin a** gangsta sh*t.
> Lil boy mind yo biness, yo best interest, we be
> flaming sh*t.
> I come from bendin dem Conrad, send em a
> message, but n***as ain't sayin sh*t.

Just pull up and airing sh*t out.
Thought I been told yaw n***as dis dangerous.

Trappin dat sh*t out da whip.
You know I stay wit a Glock and a zip.
Say no names inside dis sh*t, but n***as know
who do dem hits.
You associated wit em so now you part of da lick.
Don't f*ck wit n***as regardless cuz dats how yo
ass get blitzed. (FAH, FAH)

Ain't no getting back.
Point em out, we hittin dat.
Said you down to catch dat body, but bitch can
you sit wit dat??
Pleeeeease don't move foul, or I'm aiming
where yo ceiling at.
Buuuuuss dat sh*t down, like a Rolly, ain't no tick
wit dat. (Clock noise)

n***as weird.
They do anything fa fame.
Most dese n***as don't get money, dats no cap,
this some free game.
Yo lil bra been actin different every since they hit
dat stain.
But he gangsta in his music doe…. dat sh*t
strange, huh??

F*ck wit da gang (OSB SH*T) F*ck
wit da gang (OSB SH*T)
How yo pull up wit a n***a den turn round and
leave em to hang?? (N***A WHAT)
[N***a] we bang. (DATS OOOON ME)
[N***a] we bang. (DATS OOOON ME)
Sh*t a hit different I tell em to "freeze", I ain't
Johnny dang. (OH MY GOD)

(Exhibit No. 443.)

{¶ 117} Following a hearing, the trial court denied the motion, finding the

analysis in *Montague v. Maryland*, 471 Md. 657, 243 A.3d 546 (2020), instructive.

The court therefore concluded that "the probative value outweighs the prejudicial value there. There's a close nexus to the details of the alleged crime, and it's a close time nexus as well, which tends to prove defendant's involvement." (Tr. 176.)

{¶ 118} Over the defense's repeated objections that the lyrics spoke for themselves, Sgt. Crivel testified during trial about these rap lyrics. And although the court sustained a majority of the objections and asked Sgt. Crivel to not offer his own meaning to the lyrics, the state continued questioning him about his interpretation of what certain lyrics meant. This continued until the court asked the state to "move on." (Tr. 1119.)

{¶ 119} Sgt. Crivel testified that he found the lyrics significant because they were written approximately two hours after the shooting occurred and that it started with the phrase, "Dis Dat Killa." (Tr. 1114.) He further described certain lyrics that related to specific facts of the shooting. Sgt. Crivel noted that Guffie used the phrase that he "stay with a Glock," which he found significant because Guffie admitted to carrying a Glock and firing it on the day of the shooting. (Tr. 1115.) Next, he said that the line, "you associated wit em so now you part of da lick" drew his attention. *Id.* He described that a "lick" is "typically a robbery or a hit, or * * * organized criminal activity. So the line is saying [i]f you're associated with them, you're part of it." *Id.*

{¶ 120} Sgt. Crivel also focused on Guffie's use of the term "blitzed" in the rap, and reminded the jury that Guffie used the term "blitzed" in both of his interviews with police, describing how the masked gunmen rushed into the church

firing their guns. (Tr. 1116-1117.) He stated that this added to his suspicions that the rap lyrics were directly referencing the shooting that had occurred. *Id.* Sgt. Crivel also remarked on the words "airing something out," which he deduced to mean, "to put holes into something * * * shooting bullets." *Id.* Sgt. Crivel also referenced the lines, "point em out, we hittin dat," and "Pleeeeease don't move foul, or I'm aiming where yo ceiling at." *Id.* Lastly, he testified that the lyrics, "[h]ow yo pull up wit a n***a den turn round and leave em to hang??" resonated with the evidence that Lumpkin and Jamir had arrived together, but once the first shots were fired, Lumpkin ran away from his friend. (Tr. 1118-1119.)

{¶ 121} Guffie was asked during his own testimony about the lyrics found on his phone. He did not attempt to offer his own explanation about the lyrics but stated that he generally wrote lyrics about how he is feeling (tr. 1387) or "just stuff that I was observing in the streets. Like I said, I been dealing with it since 13 on to my adult years, so I kind of have a lot to talk about." (Tr. 1388.) When questioned directly, he stated that the lyrics did "not reference the church shooting" and it was "no particular significance." (Tr. 1386-1388.) On cross-examination, he denied that the rap lyrics were a "statement," but was rather "a general song." (Tr. 1465.)

{¶ 122} Guffie contends in this seventh assignment of error that the trial court abused its discretion in admitting evidence of his rap lyrics because they were far more prejudicial than probative of any issue in question, resulting in a deprivation of his due process right to a fair trial. He summarily contends that the rap lyrics were irrelevant, and that even if they were relevant, the danger of unfair

prejudice, confusion of the issues, or misleading the jury, outweighed the probative value. In support, Guffie references no Ohio case law, but cites only to Nevada and New Jersey case law that held that rap lyrics are often less than truthful accountings of criminal activity and are highly prejudicial because they contain inflammatory language that can be distasteful thus risk poisoning a jury. *Holmes v. State*, 129 Nev. 567, 306 P.3d 415 (2013); *State v. Skinner*, 218 N.J. 496, 95 A.3d 236 (2014).

{¶ 123} Under Evid.R. 402, only relevant evidence is admissible. Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Nevertheless, even relevant evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). Further, relevant evidence "may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 403(B). "Unfair prejudice" is "that quality of evidence that might result in an improper basis for a jury decision." *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 24. Therefore, evidence that "'arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish'" may be unfairly prejudicial. *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001), quoting *Weissenberger's Ohio Evidence*, Section 403.3, 85-87 (2000). Evidence that is unfairly prejudicial "appeals to the jury's emotions rather than intellect." *Id.*

{¶ 124} This court has not considered the admissibility of defendant-authored rap lyrics in this context where the state is attempting to use the lyrics as a statement by the defendant or a confession. Other courts in Ohio, however, have addressed song lyrics, including those that appear in rap form.

{¶ 125} In *State v. Lee*, 1st Dist. Hamilton No. C-160294, 2017-Ohio-7377, the First District found no error in the trial court's admission of a "Note" found on the defendant's phone that contained rap lyrics, written two hours before the robbery, which referenced a robbery and needing money. The *Lee* Court found that the lyrics were not overly prejudicial because "[t]he subject of the note and its temporal proximity to [the] robbery is sufficient to demonstrate its probative value." *Id.* at ¶ 10

{¶ 126} In *State v. Dunn*, 5th Dist. Stark No. 2008-CA-00137, 2009-Ohio-1688, ¶ 131, the court concluded that Dunn's rap lyrics found in a notebook was a "confession" because the words and lyrics the defendant used mirrored the wounds the victim suffered.

{¶ 127} In *State v. Copley*, 10th Dist. Franklin No. 04AP-511, 2005-Ohio-896, the Tenth District held that the trial court properly admitted the defendant's notepad that contained lyrics the defendant agreed pertained to the victim's death. The court found that the lyrics "expound[ed] on [the defendant's] mental state at the time he shot [the victim]" and that "aspects of the lyrics rebut [the defendant's] self-defense claim." *Id.* at ¶ 30. The court also rejected the defendant's contention that the lyrics' probative value was substantially outweighed by unfair prejudice,

noting that the lyrics "vividly describe[d] the shooting and his reactions" and were "nothing more than [the defendant's] own version of events surrounding the shooting." *Id.* at ¶ 33.

{¶ 128} We find, much like the trial court, *Montague*, 471 Md. 657, 243 A.3d 546, instructive. In *Montague*, the court discussed at length the admissibility and prejudicial effect of rap lyrics authored by a defendant. The court started with the basic framework set forth in *Hannah v. State*, 420 Md. 339, 23 A.3d 192 (2011), wherein the court established and held that the admissibility of rap lyrics as impeachment evidence can be unfairly prejudicial because of the potential to highlight a defendant's propensity for violence. The court noted:

> we agree with the distinction between the admissibility of rap lyrics that include "statements of historical fact" and those that are "works of fiction." Indeed, some rap lyrics — and other artistic expressions — that have a close nexus to the details of an alleged crime should be admitted if they are relevant and survive a weighing of probative value against unfair prejudice.

*Id.* at 679-680, quoting *Hannah* at 348. After reviewing out-of-state cases, the court established two guiding principles: (1) even when probative, rap lyric evidence has inherent prejudicial effect, and; (2) the probative value of rap lyric evidence may outweigh that prejudicial effect when lyrics bear a close nexus to the details of the alleged crime. *Id.* at 687.

{¶ 129} Applying its "nexus" test, the *Montague* Court concluded that the defendant's jailhouse rap lyrics were admissible as substantive evidence that the defendant shot and killed the victim. The court found that a "close factual nexus

exist[ed]" between the lyrics and the details of the victim's murder, including word choice and usage. The court also found that because the lyrics were recorded less than a year after the murder and three weeks before trial, "their close temporal nexus to the crime further[ed] their probative value as substantive evidence of [the defendant's] guilt." *Id.* at 693-694.

{¶ 130} We find that based on the foregoing, lyrics to a song, whether in the form of a rap or other poetic style, can be insightful tools as to how a person is feeling during that given moment, or can be entirely works of fiction. *See State v. Rohde*, 2d Dist. Montgomery No. 26087, 2014-Ohio-5580 (determined the poem of a child in a sex abuse case was more fictional).[7] Accordingly, poems or lyrics can be very relevant, depending on the circumstances.

{¶ 131} A danger can exist, however, when these words are used for an improper purpose. *See Skinner* (state's use of rap lyrics as other acts evidence held

---

[7] In *Skinner*, 218 N.J. 496, 499, 95 A.3d 236, the court discussed the problems in interpreting lyrics and other artistic expressions, by noting,

In assessing the probative value of defendant's fictional lyrics, the Court notes that probative evidence may not be found in an individual's artistic endeavors absent a strong nexus between specific details of the artistic composition and the circumstances of the offense for which the evidence is being adduced. The Court explains that the difficulty in identifying probative value in fictional or other forms of artistic self-expressive endeavors is that one cannot presume that, simply because an author has chosen to write about certain topics, he or she has acted in accordance with those views. One would not presume that Bob Marley, who wrote the well-known song "I Shot the Sheriff," actually shot a sheriff, or that Edgar Allan Poe buried a man beneath his floorboards, as depicted in his short story "The Tell-Tale Heart," simply because of their respective artistic endeavors on those subjects. The Court reasons that defendant's lyrics should receive no different treatment.

improper); *State v. Evans*, 10th Dist. Franklin No. 01AP-594, 2001-Ohio-8860 (examined whether a rap poem admitted solely for handwriting comparison was unfairly prejudicial).

{¶ 132} Another danger is what interpretation the reader, who brings in their own experiences or motivations, gives to those lyrics, certain words, or phrases.[8] Accordingly, we find that the trial court was correct in its attempt to limit Sgt. Crivel's testimony regarding his interpretation of Guffie's lyrics.

{¶ 133} In this case, whether Guffie's lyrics qualify as a confession, as the state suggests, is questionable. But based on the rationale in *Lee*, *Copley*, and *Montague*, this court finds that the court did not abuse its discretion in permitting the state to introduce the lyrics into evidence because of the temporal nexus between when the lyrics were written — two hours after the shooting — and the words and phrases Guffie used.

{¶ 134} During his testimony, Guffie's counsel questioned him about the lyrics and their content. He had every opportunity to explain the context of the

---

[8] In *State v. Lavender*, 1st Dist. Hamilton No. C-230042, 2024-Ohio-229, ¶ 32, the defendant sought postconviction relief, contending that counsel failed to adequately explain or mitigate his inculpatory text messages. In support, the defendant submitted the affidavit of Law Professor Andrea Dennis, whose research focused on "the ways in which rap lyrics, hip-hop, and more recently, social media are used as evidence by prosecutors in criminal trials." In her affidavit, Professor Dennis opined that an expert in African-American Vernacular English should have been used to help the jury understand the defendant's text messages. For example, she pointed to the state's interpretation of the defendant's text that said, "You got some money I can hold." She stated that the state provided testimony at trial that that text meant the defendant was "asking for money to have" but Professor Dennis said that text would more correctly be interpreted as asking for money to borrow.

lyrics, why he used certain words, his interpretation of phrases, and the ultimate meaning behind the lyrics. Instead, he stated that the lyrics "were not about the church shooting," and were "no particular significance." (Tr. 1386.) It was within the province of the jury to believe or disbelieve Guffie while keeping in mind that Guffie used the term "blitzed" and penned the lyrics within hours after the shooting where Guffie stated that he feared for his life to justify the use of deadly force. A reasonable juror could believe that the rap was Guffie's reflection of the event that occurred, whether he was part of the plan or not.

{¶ 135} Even if the court erred in admitting the lyrics or permitting Sgt. Crivel to offer his interpretation of those lyrics, the error would be harmless because it would not have affected the outcome of the case. *See* Crim.R. 52(A) (unless the error, defect, irregularity, or variance affects a defendant's substantial rights thereby causing prejudice, it shall be disregarded.) Other admissible evidence was presented that permitted the jury to find Guffie culpable, including deleted texts, the money transaction, FaceTime calls with Eric, Guffie lying to the police on multiple occasions regarding his firearm, and that he had shot Jamir at least once.

{¶ 136} Accordingly, this court finds that the trial court did not abuse its discretion in permitting the state to introduce the rap lyrics discovered on Guffie's cell phone that he penned just hours after the shooting at the church. The seventh assignment of error is overruled.

### D. Maple Heights Murder Connection

{¶ 137} Maple Heights Detective Andrew Sperie testified about Tyler's murder that occurred in Maple Heights on July 5, 2021, two weeks before the church shooting. He stated that Tyler and Eric were cousins. Over objection, Det. Sperie stated that during his investigation he learned that Lumpkin's silver Mercedes C350, identified in surveillance videos, was the vehicle suspected of being involved in Tyler's murder and that Lumpkin was a "person of interest." Also, over objection, Det. Sperie stated that there was an "NIBN [National Integrated Ballistic Imaging Network] match between [the Maple Heights] case and the [church shooting] case," and he gave Sgt. Crivel the shell casings recovered from the Maple Heights crime scene. On cross-examination, Det. Sperie admitted that Tyler's murder was unsolved, no one had been charged, and that Guffie was not connected to Tyler's murder.

{¶ 138} The defense further objected to Kooser's testimony about his ballistic examination and comparison of shell casings found at the church and those recovered from the Maple Heights homicide. Kooser stated that ten of the shell casings from the church shooting matched three of the shell casings from the Maple Heights crime scene and that all 13 were fired from the Springfield firearm that Tyler had owned.

{¶ 139} In his eighth assignment of error, Guffie contends that the trial court abused its discretion in admitting evidence of the unprosecuted murder of Tyler in

Maple Heights, and a ballistic "match" between the Maple Heights scene and the Cleveland scene, resulting in a deprivation of his due process right to a fair trial.

{¶ 140} Guffie first contends without explanation that the evidence was improper Evid.R. 404(B) evidence. This court does not find that Det. Sperie's testimony or the ballistic evidence qualifies as Evid.R. 404(B) evidence because it does not implicate Guffie in any way — it was not improper character evidence, nor was it introduced as other crimes or prior acts involving Guffie. Accordingly, this argument is without merit.

{¶ 141} Guffie next contends that the evidence was irrelevant, lacked foundation, and thus inadmissible. Under Evid.R. 402, only relevant evidence is admissible. Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.

{¶ 142} The evidence presented by Det. Sperie was relevant under Evid.R. 401. Guffie was charged with conspiracy to commit murder and/or felonious assault under R.C. 2923.01(A)(1). In order to prove conspiracy, the state was required to prove, in part, that Guffie planned or aided in the planning of a murder and/or felonious assault with the purpose to commit the aforementioned crimes or that he promoted the facilitation of said crimes. R.C. 2923.01(A)(1). Additionally, Guffie was charged (although later acquitted) with aggravated murder under R.C. 2903.01(A), which required the state to prove that Guffie purposely, and with prior calculation and design, caused Jamir's death

{¶ 143} We find that Det. Sperie's testimony was relevant because it explained the chain of custody of the shell casings collected in Maple Heights; demonstrated how Kooser was able to make the connection between Tyler's firearm and the two crime scenes; and connected Lumpkin's vehicle at both scenes. All of this evidence was probative and relevant to demonstrate Guffie's connection with his unindicted co-conspirator(s) and their intent to harm or kill Lumpkin and Jamir. The testimony and evidence introduced through Det. Sperie was relevant. Accordingly, the trial court did not abuse its discretion in admitting evidence of Tyler's murder and the ballistic evidence associated with that investigation. Guffie's eighth assignment of error is overruled.

## VII. Jury Instruction — Flight

{¶ 144} In his ninth assignment of error, Guffie contends that the trial court abused its discretion in giving the jury an instruction on "flight," thereby resulting in a deprivation of his due process right to a fair trial.

{¶ 145} The giving of jury instructions is within the sound discretion of the trial court, and we review it for an abuse of discretion. *State v. Dunn*, 8th Dist. Cuyahoga No. 101648, 2015-Ohio-3138, ¶ 48.

{¶ 146} In this case, the trial court gave the following instruction to the jury on flight:

> Now, "consciousness of guilt," "flight." Testimony has been admitted indicating that the defendant fled the scene. You are instructed that the fact that the defendant fled the scene does not raise a presumption of guilt, but it may tend to indicate the defendant's consciousness of guilt.

If you find that the facts do not support that the defendant fled the scene, or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider the evidence — this evidence for any other purpose.

However, if you find that the facts support that the defendant engaged in such conduct, and if you decide that the defendant was motivated by a consciousness of guilt, you may, but are not required to, consider that evidence in deciding whether the defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give to this.

(Tr. 1523-1524.)

{¶ 147} "'"[A] mere departure from the scene of the crime is not to be confused with deliberate flight from the area in which the suspect is normally to be found."'" *Dunn* at ¶ 51, quoting *State v. Santiago*, 8th Dist. Cuyahoga No. 95516, 2011-Ohio-3058, ¶ 30, quoting *State v. Norwood*, 11th Dist. Lake Nos. 96-L-089 and 96-L-090, 1997 Ohio App. LEXIS 4420 (Sept. 30, 1997). It must be clear that the defendant took affirmative steps to avoid detection and apprehension beyond simply not remaining at the scene of the crime. *Dunn* at ¶ 52.

{¶ 148} Guffie's mere departure from the scene was insufficient to trigger the flight instruction. However, Guffie took additional affirmative steps to avoid detection and his involvement in the shooting — disposing of his firearm, deleting social media conversations and text messages, and lying to police. *See Hurt*, 8th Dist. Cuyahoga No. 110732, 2022-Ohio-2039, at ¶ 75 (flight instruction proper when defendant made a deliberate attempt to conceal evidence and evade detection, and despite asserting self-defense he did not turn himself in). Accordingly, the flight instruction was proper.

{¶ 149} Even if this court were to find that the instruction was not warranted, we cannot say, nor has Guffie demonstrated, that the error was prejudicial. "A reviewing court may not reverse a conviction in a criminal case due to jury instructions unless it is clear that the jury instructions constituted prejudicial error." *State v. McKibbon*, 1st Dist. Hamilton No. C-010145, 2002-Ohio-2041, ¶ 27, citing *State v. Adams*, 62 Ohio St.2d 151, 154, 404 N.E.2d 144 (1980). In order to determine whether an erroneous jury instruction was prejudicial, a reviewing court must examine the jury instructions as a whole. *State v. Harry*, 12th Dist. Butler No. CA2008-01-013, 2008-Ohio-6380, ¶ 36, citing *State v. Van Gundy*, 64 Ohio St.3d 230, 233-234, 594 N.E.2d 604 (1992). "A jury instruction constitutes prejudicial error where it results in a manifest miscarriage of justice." *State v. Hancock*, 12th Dist. Warren No. CA2007-03-042, 2008-Ohio-5419, ¶ 13. Conversely, "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Crim.R. 52(A).

{¶ 150} Reviewing the jury instructions as a whole, we cannot say that the trial court's instruction on flight was prejudicial, such that a manifest miscarriage of justice occurred. The instruction given allowed the jury to make its own conclusions on flight and to consider Guffie's motivation for leaving. In fact, Guffie testified and explained why he did not stay at the scene until police arrived and why he did not immediately contact police. Furthermore, the jury heard Guffie explain to Sgt. Crivel during his July 24, 2021 interview that he was not comfortable calling them, even when he needed assistance. Accordingly, we cannot say that the trial court

abused its discretion in giving a flight jury instruction or that it constituted prejudicial error if wrongfully given. Guffie's ninth assignment of error is overruled.

## VIII. Cumulative Effect

{¶ 151} Guffie contends in his tenth assignment of error that the cumulative effect of multiple errors at trial, even if singularly not sufficient to warrant reversal, together deprived him of a fair trial and a denial of due process.

{¶ 152} Under the cumulative-error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223. We have found no unfairly prejudicial error. Thus, the doctrine of cumulative error does not apply to this case, and we overrule this assignment of error.

{¶ 153} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, ADMINISTRATIVE JUDGE

SEAN C. GALLAGHER, J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR