[Cite as *State v. Williams*, 2025-Ohio-107.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                                No. 113737

    v.                                      :

RODNEY WILLIAMS,                        :

    Defendant-Appellant.         :

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 16, 2025

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-657446-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Anna M. Faraglia and Morgan Austin, Assistant Prosecuting Attorneys, *for appellee*.

P. Andrew Baker, *for appellant*.

EMANUELLA D. GROVES, P.J.:

{¶ 1} Defendant-appellant, Rodney Williams ("Williams"), appeals his convictions for murder and felonious assault, claiming that they are against the manifest of the evidence. Williams also asserts that his sentences for two firearm specifications should have been merged. For the following reasons, we affirm.

**Procedural History**

{¶ 2} Johnny Horne ("Mr. Horne") was shot and killed in February 2021. In March 2021, a grand jury returned a five-count indictment against Williams. Count 1 charged Williams with aggravated murder, in violation of R.C. 2903.01(A); Count 2 charged him with aggravated murder, in violation of R.C. 2903.01(B); Count 3 charged Williams with aggravated burglary, a felony of the first degree, in violation of R.C. 2911.11(A)(1); Count 4 charged him with murder, in violation of R.C. 2903.02(B); and Count 5 charged him with felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(1). All counts carried one- and three-year firearm specifications.

{¶ 3} Williams filed a notice of intent to assert self-defense, a jury was impaneled, and trial commenced on February 6, 2023. The State called ten witnesses, and Williams testified on his own behalf. The following evidence was adduced throughout the course of trial.

{¶ 4} Kenneth Brooks ("Brooks") and Mr. Horne had been friends for six years. Brooks described Mr. Horne as "a little guy" that was not in good health, could barely walk, and used a cane. (Tr. 329.) Brooks never knew Mr. Horne to be violent or have firearms and described him as "very helpful [e]ven though he couldn't do anything . . . ." *Id.* at 349. Brooks planned to watch the Superbowl with Mr. Horne at Brook's friend's apartment. Brooks' friend lived in the same building as Mr. Horne. Brooks picked up Mr. Horne to buy beer for the Superbowl watch-

party, and Mr. Horne brought Williams with him. Mr. Horne introduced Williams as "Nephew."

{¶ 5} Brooks testified that while Mr. Horne was in the store, Brooks noticed that Williams had a weapon, an M&P 15-22 rifle ("rifle"), on him. Brooks confronted Williams about failing to tell him that he had a weapon in the car. Williams apologized and acknowledged that he should have told Brooks. When they got to the friend's apartment, Williams took out the rifle, removed the ammunition, and left the rifle between his legs. Everyone was having a good time. At halftime, Mr. Horne announced that he and Williams were going to Mr. Horne's apartment to finish watching the game.

{¶ 6} Following the game, Brooks tried to call Mr. Horne on Monday and Tuesday to no avail. On Tuesday, Brooks notified Mr. Horne's sister that he was unable to reach her brother. East Cleveland police officers conducted a welfare check at Mr. Horne's apartment, where he was found in a puddle of blood in the fetal position. A pellet gun was discovered under some gloves approximately four feet from Mr. Horne's body.

{¶ 7} Brooks was initially arrested for Mr. Horne's death. However, the investigation revealed that a surveillance video in the friend's apartment showed that all three men handled the rifle and Mr. Horne and Williams left together before the game was over.

{¶ 8} Mr. Horne's autopsy revealed that he suffered five gunshots wounds: one shot to the right side of the eye, right temple, right shoulder, right collarbone,

and right side of his chest. The medical examiner found that the gunshots to the right temple, collarbone, and chest were all fatal injuries. The medical examiner also testified that Mr. Horne suffered many lacerations and abrasions to the head, right knee, and the left shin that were inflicted at or near the time of his death.

{¶ 9} The investigation further revealed a total of nine shots were fired. Due to the presence of gunpowder on Mr. Horne's clothing, the State's trace evidence expert declared that at least one shot was fired at contact, meaning the muzzle was in direct connection with Mr. Horne's clothing, and two more shots were fired from no more than one foot away.

{¶ 10} Williams testified on his own behalf, admitting that he killed Mr. Horne but claiming he did so in self-defense. Williams explained that he first met Mr. Horne when he was 17 years old: Mr. Horne was exiting a store and Williams asked him for a cigarette. Williams and Mr. Horne met again at a family event and continued to see each other when Williams visited his mother, who lived in the same building as Mr. Horne. Williams and Horne became friends and never had any disagreements.

{¶ 11} On the day of the shooting, Mr. Horne and Williams watched some of the Superbowl with Brooks. Williams and Mr. Horne then went to hang out at Mr. Horne's apartment. They drank a few beers, smoked some marijuana, "sat around and chilled," and listened to music. *Id*. at 687. Williams testified:

> [Then h]e approached me, he said, Hey, let me see that. He said, let me see that. What, my gun? Because my gun — my coat is like this (indicating) and I got one button on and this button is weak, weak and

raggedy. And he said, let me see that. My gun? He like, yeah. I'm like, no, you cool, you, all right? Because he — when he left the room, he was having a frown on his face, like he — like it wasn't just — it was just out the blue. And I'm like — he said it again, let me see that? I'm like, you want to see my clip or my gun? He said, yeah, let me see that. I gave him the clip. He was like, okay, let me see that. And I'm like, no, uh-uh. And he was like, all right. I got something for you. Once he turned around, he paced to the side to the table, and then he came back to the stand, like right in front of me, and he was like, okay. And I got my leg just like this on the stool. And my gun is hanging.

. . .

Now, when he got my clip, he got my magazine, he is just like this (demonstrating), trying to pocket my magazine. He drops my magazine. When he grabs his gun, he says, I'm going to kill you. He said, I'm going to kill you. Now, when he got my magazine just like this, the magazine fell. Now, I did just like this. Just like — grab, and that's when I see him with the gun in his hand, he said directly, "I'm fitting to kill you." Now, I'm thinking that there is no type of nothing, like nothing. Once I seen the handle of the gun, I'm like, oh, shit. I step to the side, he came around, that's when I fired, and I had the round already in there. I had to reload and single shot — single shots.

(Tr. 688-690.) When asked, Williams replied that he shot four or five shots that he remembered. He stated that he was terrified when Mr. Horne pulled the gun at him. Williams also indicated he did not call the police because everyone knows East Cleveland police officers "terrorize the streets." *Id.* at 694.

{¶ 12} Ultimately, Williams' Crim.R. 29 motions for acquittal were denied and the trial court instructed the jury on self-defense. On February 13, 2023, the jury returned verdicts of not guilty on Counts 1 through 3 and guilty on Counts 4 (murder) and 5 (felonious assault), along with the accompanying firearm specifications. For the purposes of sentencing, the trial court noted that Count 5 merged into Count 4 and the State elected to proceed on Count 4. Williams was

sentenced to life imprisonment with parole eligibility after serving a full 21 years. The six-year mandatory prison term for the firearm specifications was ordered to be served prior and consecutive to 15 years to life imprisonment on the base charge for a total sentence of 21 years to life. Finally, Williams was declared a violent offender.

{¶ 13} Williams appealed and raised the following assignments of error.

**Assignment of Error No. 1**

[Williams'] convictions were against the manifest weight of the evidence.

**Assignment of Error No. 2**

The separate sentences on the two firearm specifications should have been subject to merger.

**Law and Analysis**

{¶ 14} In his first assignment of error, Williams argues his convictions were against the manifest weight of the evidence because the State produced no evidence to rebut his self-defense claim.

{¶ 15} R.C. 2901.05(B)(1) provides:

A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

A self-defense claim under R.C. 2901.05(B)(1) includes three elements:

"(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger."

*State v. Messenger*, 2022-Ohio-4562, ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). Self-defense generally presents an issue of credibility, and the trier of fact is left to decide whether the State disproves any of the claim's elements. *State v. Scales*, 2024-Ohio-2171, ¶ 29 (8th Dist.), citing *State v. Walker*, 2021-Ohio-2037, ¶ 13 (8th Dist.), and *State v. Davidson-Dixon*, 2021-Ohio-1485, ¶ 36 (8th Dist.). "'The State's . . . burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal.'" *State v. Nicholson*, 2024-Ohio-604, ¶ 72, quoting *Messenger* at ¶ 27 (holding that "the sufficiency-of-the-evidence standard of review applies to [a defendant's] burden of production and a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion").

{¶ 16} In order to evaluate whether a judgment or verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving conflicts in the evidence and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Jordan*, 2023-Ohio-3800, ¶ 17, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), and *State v. Martin*, 20

Ohio App.3d 172 (1st Dist. 1983). The Ohio Supreme Court has repeatedly held that "[a] manifest-weight challenge should be sustained ""only in the exceptional case in which the evidence weighs heavily against the conviction."""" *Nicholson* at ¶ 71, quoting *Thompkins* at 387, quoting *Martin* at 175; *State v. Hundley*, 2020-Ohio-3775, ¶ 80.

{¶ 17} On appeal, Williams claims that the pellet gun located near Mr. Horne's body, which appeared to be an actual firearm, proves that Williams was not the aggressor, had a bona fide belief that he was in danger of death or great bodily harm, and had no option to retreat. In response, the State counters that the record raises questions regarding Williams' credibility and the evidence supports the jury's finding that Williams did not act in self-defense.

{¶ 18} Based on our review of the record, we cannot say that this is the exceptional case contemplated by the Ohio Supreme Court or that the jury clearly lost its way in disbelieving Williams' testimony. The State presented evidence that Mr. Horne showed concern for Williams for years and even referred to him as "Nephew." Despite Williams' testimony regarding the sudden change to Mr. Horne's demeanor, the State presented further evidence that Mr. Horne was not violent; rather, he was described as a helpful and feeble man who used a cane and was not known to have firearms. The record reveals that Mr. Horne was shot five times, three of which were fatal, and suffered many lacerations and abrasions. Williams did not report the shooting, and Mr. Horne's killing was not discovered until a wellness check was conducted days later. Williams' failure to contact police after the

shooting further brings his self-defense claim into doubt. *See, e.g., State v. Guffie*, 2024-Ohio-2163, ¶ 83 (8th Dist.) (finding that the jury and this court could reasonably conclude that the defendant was not acting in self-defense after he failed to come forward after discharging his firearm because "[h]is claim of self-defense should have outweighed any thought of being accused of murder or attempted murder"). Accordingly, we find that the jury's rejection of Williams' self-defense claim is not against the manifest weight of the evidence; a jury could properly conclude beyond a reasonable doubt that Williams did not act in self-defense. Thus, we overrule Williams' first assignment of error.

{¶ 19} In his second assignment of error Williams argues that the two separate firearm specifications attached to Counts 4 (murder) and 5 (felonious assault) were subject to merger. Williams acknowledges that in *State v. Bollar*, 2022-Ohio-4370, the Ohio Supreme Court held that imposing separate firearm-specification sentences was not only permissible, but required, under R.C. 2929.14(B)(1)(g).

{¶ 20} In *Bollar*, the Ohio Supreme Court held that the plain language of R.C. 2929.14(B)(1)(g) requires that certain offenders receive prison terms for multiple specifications, finding:

> That statute requires that the offender receive prison terms for each of the two most serious firearm specifications when the offender pleads guilty to multiple felony offenses (and at least one of those is a felony listed in the statute) and also pleads guilty to multiple accompanying specifications. The statute makes no exception to the application of its provision if one of the underlying felony offenses has been merged. Instead, it simply applies whenever the offender has pleaded guilty to

(or been found guilty of) multiple felony offenses and multiple specifications.

*Id.* at ¶ 19. The Ohio Supreme Court deferred to the legislature's exercise of discretion in enacting R.C. 2929.14(B)(1)(g), noting that in requiring certain offenders to be subject to separate prison terms for multiple firearms specifications, "the General Assembly appears to have acknowledged that the use of firearms in certain violent crimes should carry a hefty penalty." *Id.* at ¶ 20. Consequently, we follow binding precedent and find that Williams' firearm specifications for Counts 4 and 5 did not merge for sentencing purposes. Accordingly, Williams' assignment of error is overruled and his convictions are affirmed.

**{¶ 21}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, PRESIDING JUDGE

MARY J. BOYLE, J., and
MICHAEL JOHN RYAN, J., CONCUR